JAQAY L. CARLYLE (SBN: 300979)
LINDSAY CRONIN (SBN: 359821)
JILLIAN LYNK (SBN: 360377)
**PLUMMER CARLYLE WILLIAMS LLP**
1033 E. Imperial Highway, Suite E9
Brea, CA 92821
(424) 476-7249

*Attorneys for Kaedin Robinson*

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| KAEDIN ROBINSON | Case No. 2:25-cv-06454 |
| Plaintiff, | |
| v. | **COMPLAINT** |
| NATIONAL COLLEGIATE ATHLETIC ASSOCIATION, | |
| Defendant. | **DEMAND FOR JURY TRIAL** |

Plaintiff Kaedin Robinson ("Robinson"), by and through his undersigned attorneys, by way of Complaint against defendant National Collegiate Athletic Association (the "NCAA"), hereby alleges as follows:

### SUMMARY OF THE ACTION

1.      This is an action for immediate and permanent injunctive relief, compensatory and punitive damages, and attorneys' fees and costs to enjoin and redress the NCAA's enforcement against Robinson, an athlete selected to join the University of California, Los Angeles ("UCLA") football team, of an unlawful eligibility rule that would prevent him from competing for UCLA in the 2025-2026 season in violation of federal antitrust laws.

2.      The eligibility rule at issue is unlawful because it has substantial anticompetitive effects on two-year or junior colleges and universities that are excluded from NCAA membership. Under NCAA rules governing Division I colleges and universities, college athletes are only allowed to compete in intercollegiate sports for four (4) years within five (5) calendar years. This

five-year period includes time spent at a two-year or junior college. The effect of this rule (the "Five-Year Rule") is to discourage college athletes from attending junior college to prepare for a four-year college and to punish those who do so, even though junior colleges may provide such college athletes with necessary academic and other opportunities. Just as the college athletes are deprived of the junior-college experience that may so benefit them, the junior colleges are deprived of elite athletes, reducing their ability to compete with NCAA schools.

3.     The effect of the NCAA's anticompetitive conduct is evident as it relates to Robinson, an elite athlete who attended a junior college in 2019 to begin his collegiate career and faced significant disruptions due to the COVID-19 pandemic, which forced him to miss opportunities to compete. Under the circumstances, UCLA requested that the NCAA exercise its discretion to waive the Five-Year Rule as it applies to Robinson, but the NCAA has refused to do so. Unless enjoined, the effect of the NCAA's anticompetitive conduct will be to penalize Robinson for having attended a junior college and for the disruptions caused by the pandemic. It will also permanently deprive him of a once-in-a-lifetime name, image, and likeness ("NIL") contract that was worth approximately $450,000 when Robinson was recruited to UCLA and the opportunity to enhance his career and reputation by playing another year of Division I football, his first at a Big Ten school. The NCAA's anticompetitive conduct, coupled with its unreasonable denial of Robinson's meritorious request for a waiver, thus threatens him with immediate irreparable harm.

4.     Because the NCAA's violation of federal antitrust law is so clear, Robinson seeks to enjoin the NCAA from enforcing the Five-Year Rule as it applies to him while he pursues his antitrust claim in this action. Robinson seeks a temporary injunction now because UCLA began practicing on April 2, 2025, and such team practices are ongoing, and absent immediate injunctive relief, he will be prevented from participating in that critical preparation for the 2025-2026 season.

//

//


**JURISDICTION AND VENUE**

5.    This Court has subject matter jurisdiction over all claims at issue in this action pursuant to 28 USC §§ 1331, 1332, and 1367(a). The Court has federal-question jurisdiction over Robinson's claim for violations of the Sherman Act.

6.    This Court may exercise personal jurisdiction over the NCAA because it and its member institutions currently engage in continuous and systematic business in the Central District of California, including athletic competitions, ticket and merchandise sales, television agreements, and other revenue-generating activities, and have directed many of the specific acts alleged in the Complaint within this District.

7.    Venue is proper in this District pursuant to 28 U.S.C. §1391(b)(2)-(3) because a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this District and because the NCAA is subject to personal jurisdiction in this District. Robinson was offered and accepted an opportunity to enroll at UCLA and play football for the Bruins in the Big Ten Conference. UCLA is based in this District. This action arises in Los Angeles County because that is where a substantial part of the events that give rise to the claim occurred. Within Los Angeles County is found the University of California, Los Angeles campus. UCLA, for example, fields 25 Division I intercollegiate sports teams.

**THE PARTIES**

8.    Robinson is a United State citizen who was selected by UCLA to play as a member of its football team in the 2025-2026 season.

9.    NCAA is an unincorporated association headquartered in Indianapolis, Indiana, that serves as the governing body of college sports. It is, therefore, a citizen of the State of Indiana. NCAA includes more than 1,100 member colleges and universities throughout the United States, including institutions in the Central District of California.

//

//

//

**FACTUAL ALLEGATIONS**

A.    The Relevant NCAA Eligibility Rules And Their Discriminatory, Anticompetitive Effects On Junior Colleges.

10.    The NCAA is a voluntary, self-governing association of approximately 1,100 four-year colleges and universities that administers athletic competition for college athletes.

11.    As the NCAA acknowledged in *NCAA v. Alston,* 594 U.S. 69, 90 (2021), its member schools collectively enjoy a monopoly in the market for college athlete services, such that it restraints can and do harm competition. With such power, the NCAA has grown into what one court has described as a "financial behemoth," with "revenues often exceeding $1 billion annually." *Johnson v. NCAA,* 108 F.4th 163, 170 (3d Cir. 2024).

12.    Excluded from NCAA membership are two-year colleges ("Junior Colleges"), many of which are members of the National Junior College Athletic Association ("NJCAA"), an organization designed to promote, govern, and foster a competitive environment for two-year college athletics. The NJCAA has no affiliation with the NCAA.

13.    The NCAA has three divisions: Division I, Division II, and Division III, each of which promulgates its own rules and operating guidelines. These rules include those that determine the eligibility of college athletes to participate in intercollegiate athletics.

14.    As a general matter, Division I teams are the most popular and attract the most money and the most talented athletes.

15.    Of relevance to this action are two eligibility rules codified in the Division I 2024-2025 Manual (the "Bylaws") that have the effect of discrimination against Junior Colleges by discouraging and penalizing college athletes who attend them.

16.    The first is the Five-Year Rule. This rule forbids a college athlete from competing for a Division I school beyond the five years beginning when the student was first registered in a "collegiate institution." More specifically, the Bylaws provide, in pertinent part:

> **12.8.1 Five-Year Rule.** A student-athlete shall complete the student-athlete's seasons of participation within five calendar years from the beginning of the semester or quarter in which the student athlete first registered for a minimum full-time program of studies in a collegiate institution, with time spent in the armed services, on

official religious missions or with recognized foreign aid services of the U.S. government being excepted. . . .

**12.8.1.1 Determining the Start of the Five-Year Period.** For purposes of starting the count of time under the five-year rule, a student-athlete shall be considered registered at a collegiate institution . . . when the student-athlete initially registers in a regular term (semester or quarter) of an academic year for a minimum fulltime program of studies, as determined by the institution, and attends the student's first day of classes for that term.

17.     The second relevant rule of eligibility is the four-year limitation on intercollegiate competition (the "Intercollegiate Competition Rule"). Under this rule, a college athlete is forbidden from engaging "in more than four seasons of intercollegiate competition in any one sport." (Bylaws § 12.8.) Although Junior Colleges are excluded from Division I, the Bylaws define "intercollegiate competition" to include competition at either "a two-year or a four-year collegiate institution." (Bylaws § 12.02.6.)

18.     Notwithstanding these limitations, the NCAA maintains the discretion to waive the application of the Five-Year and Intercollegiate Competition Rules to enable college athletes to compete for NCAA member institutions.

19.     The NCAA has provided blanket waivers of the Five-Year and Intercollegiate Competition Rules to institutions in light of certain events. One such blanket waiver was granted to institutions due to the COVID-19 pandemic. This waiver permitted institutions to self-apply a waiver of the Five-Year and Intercollegiate Competition Rules for the 2020-2021 season.

20.     The NCAA also granted institutions a blanket waiver of the Intercollegiate Competition Rule in the wake of the decision of the United States District Court for the Middle District of Tennessee on December 18, 2024, in *Pavia v. NCAA,* 760 F.Supp.3d 527 (M.D. Tenn. Dec. 18, 2024).

21.     In *Pavia,* the court granted Diego Pavia ("Pavia"), the quarterback for Vanderbilt University, a preliminary injunction prohibiting the NCAA from (a) counting a year that Pavia spent playing football at a Junior College as a season of competition for purposes of the Intercollegiate Competition Rule; and thereby (b) barring Pavia, who had otherwise played just three years of Division I college football, from playing for Vanderbilt in the 2025-2026 season.

22.     The court found an injunction appropriate due to the clear anticompetitive effects the NCAA's interpretation of Intercollegiate Competition Rule—i.e., by counting Pavia's year of Junior College football as a season of competition —would have on Junior Colleges and college athletes:

> First, the challenged rules limit the NCAA Division I eligibility of student-athletes who attended junior college to two or three seasons while student-athletes who attend only NCAA Division I institutions have four years of Division I eligibility. This Rule gives a competitive advantage to NCAA Division I member schools over junior colleges—and thus the football players at each level—even though they are treated the same in terms of eligibility.
>
> The disparate treatment of these two groups also results in a distortion of the labor market for NCAA Division I football players by pushing student-athletes to attend NCAA member institutions so that they may enjoy a full four seasons of NCAA Division I eligibility even if junior college might otherwise be a better choice academically or athletically. Similarly, students who attend junior college for one year and are considering whether to continue their junior college education and obtain an associate degree or transfer to a NCAA Division I institution may be swayed in their decision by the prospect of relinquishing another year of NCAA eligibility and the accompanying competitive advantages and NIL compensation. The rule requiring forfeit of NCAA eligibility and associated NIL opportunities for junior college attendance discounts that choice.
>
> NCAA Division I member institutions compete directly with NJCAA schools or football talent. NCAA Division I offers a prospective football player significant advantages over junior college football—more exposure, potentially better competition and coaching, and financial advantages due to the NIL opportunities disproportionately offered to Division I athletes.
>
> In summary, the eligibility bylaws induce potential football players to attend NCAA institutions rather than non-NCAA institutions even when non-NCAA institutions, such as junior colleges, might be in their best interest. Therefore, the rule harms student athletes when they are making decisions on whether to attend a junior college or an NCAA institution.

23.    On December 23, 2024, following the December 18, 2024 decision in *Pavia,* the NCAA provided a blanket waiver (the "*Pavia* Waiver") of the Intercollegiate Competition Rule to any college athlete who (i) competed for a Junior College; (ii) would have been eligible to compete in the 2025-2026 season but for their time competing for a Junior College; and (iii) met all other eligibility criteria.

24.    But for the NCAA's interpretation and application of the Five-Year Rule to Robinson, he would qualify for the *Pavia* Waiver.

B.    Robinson's Background And Collegiate Sporting Experience From 2019 Through The 2024-2025 Season.

25.    Robinson is a talented and highly sought-after football player. The relevant details of his college football career are provided below.

26.    **2019-2020 Season.** Robinson enrolled at a junior college (ASA Brooklyn) for the 2019-2020 season and competed on its football team. This was his first year of competition, but such competition was not NCAA-sanctioned.

27.    **2020-2021 Season.** The 2020-2021 season at ASA Brooklyn was cancelled due to the COVID-19 pandemic. Robinson was unable to compete and spent approximately nine (9) months at home. He received a self-applied COVID-19 extension of eligibility waiver from the NCAA via the Committee on Student-Athlete Reinstatement Previously Approved List (PAL).

28.    **Spring 2021.** Robinson transferred to the University of Central Florida ("UCF") in January 2021. Since football is a Fall sport, there was no competition during the Spring semester.

29.    **Fall 2021.** At UCF, Robinson was redshirted by the coaching staff and did not compete, although he was on the squad list and was otherwise academically and athletically eligible. He was not physically prepared to compete after an extended period without organized training due to the pandemic. This year did not count toward the Intercollegiate Competition Rule.

30.    **Spring 2022.** Robinson transferred to Appalachian State University ("App State"). Since football is a Fall sport, there was no competition during the Spring semester.

31.    **2022-2023 Season.** Robinson competed on the App State football team. He ranked third on the team in catches (27) and receiving yards (419). This counted as Robinson's first year under the Intercollegiate Competition Rule.

32.    **2023-2024 Season.** Robinson continued at App State and competed on its football team. He received All-Sun Belt honors and started all 14 games. He was tied for the Sun Belt Conference lead with 10 touchdown receptions. Robinson had 4 100-yard receiving games during the season and ended the season with the most single-season receiving yards by an App State player in the FBS era. This counted as Robinson's second year under the Intercollegiate Competition Rule.

33.    **2024-25 Season.** Robinson competed at App State. He was honored with the selection to All-Sun Belt first team and played in nine games before incurring a season-ending injury. Despite the injury, Robinson led App State in receptions and yards and ranked 10th nationally with 93.3 receiving yards per game. This counted as Robinson's third year under the Intercollegiate Competition Rule.

34.    **Spring 2025.** Robinson transferred to UCLA, where he is currently enrolled. The ruling from the court in *Pavia* gave the UCLA coaches and Robinson hope that he could play for another season. The expectation was that Fall 2025 would count as Robinson's fourth and final year under the Intercollegiate Competition Rule.

35.    Despite the challenges posed by the COVID-19 pandemic and his redshirt year, Robinson has excelled in his collegiate career, showcasing his talent and dedication to the sport. In 2024, Robinson was named to the All-Sun Belt first team and was ranked 10th nationally and No. 2 in the Sun Belt Conference at 93.3 receiving yards per game. He caught a pass in 34 consecutive App State games before he was injured on a touchdown catch against Coastal Carolina late in the 2024 season.

C.    <u>Robinson's Decision To Join UCLA, The NCAA's Denial Of UCLA's Request For A Waiver, And The Need For Immediate Injunctive Relief.</u>

36.    Following his successful tenure at App State, Robinson learned of the *Pavia* decision, sought to continue his football career at a prestigious institution, entered the transfer

portal, and received a lot of interest from many institutions. He was offered and accepted an opportunity to enroll at UCLA and play football for the Bruins in the Big Ten Conference.

37. Robinson's decision to commit to and enroll at UCLA was based in part on an NIL contract that was offered to him worth approximately $450,000, a significant source of income for him and his family.

38. Shortly after extending this opportunity to Robinson, UCLA requested that the NCAA waive enforcement of the Five-Year Rule, which would enable Robinson to compete in the 2025-26 season. UCLA and Robinson believed that Robinson was eligible to play in the 2025 season as a result of the *Pavia* decision and *Pavia* Waiver and because Robinson maintained eligibility under the Intercollegiate Competition Rule.

39. On March 11, 2025, the NCAA informed UCLA that its waiver request was denied, citing that Robinson did not meet the criteria for an extension of eligibility.

40. Given the NCAA's refusal to grant Robinson a waiver, he has filed this action to obtain injunctive relief from this Court. The need for such relief is urgent, as UCLA's Spring practice began on April 2, 2025, and without eligibility, Robinson has not and will be unable to participate, jeopardizing his position on the team and his future opportunities. These practices are critical and irreplaceable to both the team and Robinson, as they would facilitate his integration into the Bruin's overall strategy and enable Robinson to develop a rapport with the UCLA coaching staff and teammates. UCLA has already attempted to reduce the amount of money that Robinson will receive through his NIL contract as a result of the NCAA's denial of UCLA's waiver request.

D. Relevant Markets.

41. As the *Pavia* court found, the relevant market for purposes of this case is "the labor market for college football athletes in general and NCAA Division I football specifically." *Pavia*, 760 F.Supp.3d at *539.

42. The United States is the relevant geographic market, and the NCAA and its member institutions are located in that geographic market.

43.     College athletes compete to earn spots on NCAA Division I athletic teams, and NCAA member institutions compete with other institutions to attract and secure top-level college athletes. NCAA member institutions secure college athletes through the provision of various in-kind benefits, including full and partial scholarships, advanced academic programming, access to state-of-the-art training and rehabilitation facilities, and premier instruction from knowledgeable coaching staff.

44.     Participating in NCAA Division I athletics provides significant benefits and opportunities to college athletes, including: (1) the ability to maximize their chances to play professional sports by providing extensive exposure to scouts; (2) the opportunity to compete against the nation's best amateur athletes; (3) national publicity through nationwide broadcasting of sporting events; (4) full and partial scholarships; (5) the opportunity to earn personal sponsorship opportunities and marketing deals; (6) the ability to capitalize on NIL agreements, which sometimes provide millions of dollars in financial benefits; and (7) receipt of top-tier academic support through college athlete assistance programs.

45.     The most talented college athletes have no practical alternatives in the relevant markets to participating in NCAA Division I athletics.

46.     The NCAA has sole rule-making authority and maintains exclusive power over the promulgation of rules and regulations for its member institutions.

47.     Though the NCAA is a non-profit organization, its member institutions reap significant financial gains through the transactions they make with college athletes. Member institutions reap revenue through hosting athletic events on their campuses, merchandise sales, television broadcasting contracts, and the generation of interest in their institutions. In return, the college athletes receive the many benefits enumerated above.

48.     Accordingly, the transactions between member institutions and college athletes are inherently commercial and fall within the purview of the Sherman Act.

E.     Anti-competitive Effects.

49.     The NCAA enacts and enforces rules that it claims promote fairness and the well-being of college athletes while preserving true athletic amateurism. These rules are adopted

through the NCAA Division I Council and member institutions, effectively making the rules the practical equivalent of horizontal agreements among the NCAA and the member institutions that compete against one another for the labor of college athletes.

50.     The NCAA's refusal to grant Robinson the requested waiver has direct anticompetitive effects that harm junior colleges, college athletes, and consumers of college athletics.

51.     By including time spent at junior colleges in the Five-Year Rule, the NCAA discourages college athletes from attending junior colleges, thereby harming the ability of junior colleges to compete with NCAA schools for talented athletes. More specifically, as the court in *Pavia* found, enforcing NCAA rules that discourage or penalize college athletes from attending Junior Colleges harms the Junior Colleges' ability to compete with Division I schools for talented athletes and limits the choice of educational institutions available to college athletes.

52.     Additionally, the NCAA's failure to adequately account for the disruptions caused by the COVID-19 pandemic, such as the cancellation of the 2020-21 season, further restricts college athletes' eligibility and opportunities.

53.     Consumers of Division I intercollegiate events are also harmed, as the competitiveness of teams is reduced due to restrictions on elite athletes who attended Junior Colleges or faced pandemic-related disruptions.

F.     The NCAA's Rule of Restitution.

54.     The NCAA's Rule of Restitution (Bylaw § 12.11.4.2) allows the NCAA to punish a college athlete and the member school he or she attends (as well as the college athlete's teammates) if the college athlete and the school rely on a court-issued temporary restraining order ("TRO") or preliminary injunction enjoining unlawful conduct by the NCAA and mandating that the college athlete be permitted to participate in athletic competition if the TRO or injunction is later revoked for any reason.

55.     The clear purpose and effect of the Rule of Restitution is to discourage challenges to the NCAA's anticompetitive and improper rules and rulings by making it impossible for college athletes and member schools to rely on validly entered court orders and to obtain meaningful

injunctive relief. Indeed, in light of the Rule of Restitution, colleges and universities typically do not permit a college athlete to participate in athletic competition even if he or she obtains a TRO or preliminary injunction finding that an NCAA ruling is likely invalid and enjoining the NCAA from enforcing that unlawful restraint.

56.    As a result, courts, including this one, have enjoined the NCAA from enforcing the Rule of Restitution against college athletes and their respective institutions who rely on a temporary restraining order or preliminary injunction when participating in intercollegiate athletics. *See Elad v. NCAA*, No. 25-cv-1981, 2025 WL 1202014, at *11 (D.N.J. Apr. 25, 2025); *Williams v. NCAA*, No. 24-cv-614, 2024 WL 397760, at *4 (D.N.J. Feb. 2, 2024); *Pavia*, 760 F.Supp.3d at 545; *Ohio v. NCAA*, 706 F. Supp. 3d 583, 601-02 (N.D.W.V. 2023).

G.    The Irreparable Harm To Robinson.

57.    Robinson will suffer substantial irreparable harm if the Court does not grant the requested injunctive relief, including the loss of his opportunity to play for UCLA, his NIL contract that was once roughly $450,000 and has since been reduced as a byproduct of the NCAA refusing to grant UCLA's waiver request, and his chance to advance his football career for professional opportunities.

58.    By contrast, if the Court does not grant Robinson the requested injunctive relief, he will be unable to play for UCLA in its 2025-26 season. He will thus be denied the opportunity those games present to gain the attention and acclaim that can only be obtained playing for a Division I football team in one of college football's most prestigious and widely covered conferences, to take advantage of the NIL deal, and to increase his chances of earning a contract to play professional football following the 2025-26 season. Missing out on these opportunities is the very definition of irreparable harm, as this Court recently recognized. *Elad v. NCAA*, No. 25-cv-1981, 2025 WL 1202014, at *9-10 (D.N.J. Apr. 25, 2025); *Williams v. NCAA*, No. 24-cv-614, 2024 WL 397760, at *3 (D.N.J. Feb. 2, 2024).

59.    Robinson has already lost an opportunity to practice with UCLA, and, unless he is assured that he will be eligible to play during the 2025-2026 season, Robinson will continue to lose this opportunity to practice with the team. These missed practices have and will continue to

harm Robinson irreparably, as it has and will deprive him of critical and irreplaceable opportunities to become integrated into the UCLA offense and the team as a whole. Further, the more days that pass, the more likely that UCLA will sign another player at his position (wide receiver) to fill his roster spot; in that event, Robinson will lose the opportunity to play Division I college football this coming season, regardless of how his eligibility status is ultimately resolved.

60.    Despite the obvious and immediate harm that Robinson will suffer if not granted the requested relief, the NCAA has refused to grant him a waiver of the Five-Year Rule (and thus also refused to grant him the *Pavia* Waiver, which is dependent on the waiver of the Five-Year Rule). The NCAA has done so—confusingly and inconsistently—even though it granted the *Pavia* Waiver on a blanket basis for purposes of the Intercollegiate Competition Rule. This Court's immediate intervention is needed to right this wrong.

H.    <u>The NCAA's No Agent and NFL Draft Rules.</u>

61.    Thinking he no longer had any collegiate eligibility remaining, based on the NCAA's denial of UCLA's waiver request, Robinson signed with an agent to represent him in pursuing a career in professional football and entered his name into the 2025 NFL Draft.

62.    However, the *Pavia* decision and subsequent relief offered by the NCAA, through the *Pavia* Waiver, to similarly situated college athletes have changed Robinson's plan.

63.    As stated above, the *Pavia* Waiver offered college athletes an opportunity to extend their collegiate careers if they met certain criteria.

64.    Under NCAA Bylaw 12.3.1 (the "No Agent Rule"), "An individual shall be ineligible for participation in an intercollegiate sport if the individual ever has agreed (orally or in writing) to be represented by an agent for the purpose of marketing athletics ability or reputation in that sport. Further, an agency contract not specifically limited in writing to a sport or particular sports shall be deemed applicable to all sports, and the individual shall be ineligible to participate in any sport."

65.    The No Agent Rule currently prevents college athletes from signing professional representation agreements (i.e., National Football League Players Association Standard Representation Agreements, also referred to as "NFLPA SRAs") with agents. Now that athletes

can earn NIL money, they should be able to weigh whether to stay in school or play professionally, and an agent can help determine a player's pro-market value.

66.    Under NCAA Bylaw 12.2.4.2 (the "No Draft Rule"), "After initial full-time collegiate enrollment, an individual loses amateur status in a particular sport when the individual asks to be placed on the draft list or supplemental draft list of a professional league in that sport, even though: (a) The individual asks to be removed from the draft list prior to the actual draft; (b) The individual's name remains on the list but the individual is not drafted; or (c) The individual is drafted but does not sign an agreement with any professional athletics team." The only exception for someone like Robinson is no exception at all. NCAA Bylaw 12.2.4.2.4 states, "In football, a student-athlete (as opposed to a prospective student-athlete) may enter the National Football League draft one time during collegiate participation without jeopardizing eligibility in that sport, provided the student-athlete is not drafted by any team in that league and the student-athlete declares the intention to resume intercollegiate participation within 72 hours following the National Football League draft declaration date. The student-athlete's declaration of intent shall be in writing to the institution's director of athletics."

67.    The No Draft Rule allows the NCAA to punish a college athlete and the member school he or she attends (as well as the college athlete's teammates) if the college athlete enters a professional league draft (i.e., the NFL Draft) and thereafter seeks to participate in college sports if the athlete is undrafted.

68.    The No Agent Rule and No Draft Rule are commercial rules subject to antitrust analysis in a world where athletes can earn money from NIL deals. The *Pavia* court addressed the No Draft Rule and distinguished prior decisions that had found the No Draft Rule was noncommercial by stating, "It is apparent, however, that those decisions were grounded in a pre-NIL world." *Pavia*, 760 F.Supp.3d at 536. The *Pavia* court also noted that recent rule changes, such as allowing athletes unlimited transfers between schools, are not intended to "benefit an athlete's academic career and promote 'natural and standard degree progression.'" *Id* at. *543.

69.    The No Agent Rule and No Draft Rule violate antitrust laws by not allowing college athletes to properly assess their market values in a world where they, including Robinson, can earn

hundreds of thousands of dollars from NIL by remaining in college. These rules are the types of restraints the Sherman Act intends to prevent.

70.     The NCAA has previously reinstated athletes who technically violated the No Agent Rule in the wake of the *Pavia* decision and *Pavia* Waiver. Former Florida State University wide receiver Malik Benson was originally deemed ineligible to participate in Division I sports after participating at a junior college for two years and then Division I schools for the following two years. He signed an agent, and then the *Pavia* Waiver was announced. Upon request, Benson's eligibility was reinstated with no withholding penalty and no repayment of benefits received despite having signed an NFLPA SRA with an agent. As such, the same should be true for Robinson, and the same analysis should apply to the No Draft Rule as it did with the No Agent Rule.

## **COUNT ONE – VIOLATION OF §1 OF THE SHERMAN ACT**

71.     Robinson repeats and realleges the allegations contained in Paragraphs 1 through 70 of this Complaint as though fully set forth herein.

72.     The NCAA, by and through its officers, directors, employees, agents, or other representatives, has illegally restrained and suppressed competition in the relevant markets through its refusal to waive the Five-Year Rule as it applies to Robinson's time attending a junior college and facing pandemic disruptions. The threat posed by the NCAA having license to bar college athletes from realizing the opportunities they have earned without logical justification stifles the market's ability to flourish.

73.     As a direct result of the NCAA's denial of Robinson's waiver request, the NCAA will establish a precedent that it may unreasonably restrict college athletes' ability to participate in the relevant labor market.

74.     The NCAA's position results in no benefits to competition in Division I collegiate athletics for the NCAA's member institutions, college athletes, or consumers of NCAA athletic contests. Indeed, the NCAA's position is logically inconsistent with its own decision to grant college athletes a blanket waiver in these circumstances for purposes of the Intercollegiate Competition Rule.

75.     The NCAA's anticompetitive acts were intentionally directed at the United States market and have had a substantial and foreseeable effect on interstate commerce.

## COUNT TWO - BREACH OF CONTRACT

76.     Robinson repeats and realleges the allegations contained in Paragraphs 1 through 75 of this Complaint as though fully set forth herein.

77.     UCLA is a member of the NCAA Division I. As such, UCLA has agreed to submit to and abide by the NCAA's rules and regulations in exchange for the benefits of NCAA membership, such as participation in high-level intercollegiate athletic competitions. Furthermore, UCLA has agreed to subject itself to NCAA discipline for any failure to comply with its rules and regulations.

78.     Robinson, as a student-athlete enrolled at UCLA who is subject to the same NCAA rules and regulations, is an intended third-party beneficiary of the contractual relationship between UCLA and the NCAA.

79.     The NCAA has a contractual obligation to Robinson, as an intended third-party beneficiary, to enforce its rules and regulations fairly, consistently and reasonably.

80.     As detailed above, the NCAA will not deem Robinson eligible for the 2025-26 Division I college football season based on its unreasonable and arbitrary application of the Five-Year Rule and its rule counting junior college competition as intercollegiate competition, even though the recent ruling in *Pavia* makes clear that this application violates the Sherman Act and is thus unlawful and invalid.

81.     The NCAA is treating the Five-Year Rule, when coupled with the rule counting junior college competition as intercollegiate competition, as valid and enforceable but the *Pavia* ruling makes clear that it is not. As a result, the NCAA's insistence that the season Robinson spent playing football at a junior college counts as intercollegiate competition for purposes of the Five-Year Rule is directly contrary to its promise to enforce and adjudicate its rules fairly.

82.     By refusing to deem Robinson eligible for the 2025-26 Division I college football season based on the Five-Year Rule, the NCAA has breached its contractual obligations to him because there is no NCAA rule or regulation in existence that authorizes or permits those actions.

83.    As an intended third-party beneficiary of UCLA's agreement to be bound by the NCAA rules and regulations, Robinson has suffered and continues to suffer substantial and irreparable harm as a result the NCAA's denial of his eligibility to participate in athletics without any valid contractual authority. To unjustly prevent Robinson from playing football during the 2025-26 season deprives him of the once-in-a-lifetime opportunity to compete in Division I football games, improve his skills, support his teammates, and showcase his talents to future professional employers. Specifically, Plaintiff will be unable to compete in athletic competition and avail himself of the myriad opportunities that emanate from his participation, including lucrative NIL rights.

## COUNT THREE - BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

84.    Robinson repeats and realleges the allegations contained in Paragraphs 1 through 83 of this Complaint as though fully set forth herein.

85.    There is a covenant of good faith and fair dealing implied in every contract, including the contract between the NCAA and UCLA to which Robinson is an intended third-party beneficiary. That covenant imposes on the parties an obligation to treat one another reasonably and fairly, and to not do anything to destroy or injure one another's right to receive the fruits of the contract.

86.    As detailed above, the NCAA has treated Robinson unreasonably and unfairly, and has destroyed and injured his contractual rights, by counting the season Robinson spent playing football at a junior college as intercollegiate competition for purposes of the Five- Year Rule and thereby deeming him ineligible to play in the 2025-2026 season. The NCAA has engaged in this conduct for the improper purpose and ill motive of enforcing its application of the Five-Year Rule, which the *Pavia* decision makes clear is a violation of the Sherman Act.

87.    The NCAA has, therefore, breached the implied covenant of good faith and fair dealing.

88.    As a direct and proximate result of the NCAA's breach of the implied covenant of good faith and fair dealing, Robinson has suffered and will continue to suffer significant damages.

**PRAYER FOR RELIEF**

WHEREFORE, Robinson respectfully requests Judgment in his favor and against the NCAA as follows:

A.      Declaring that (i) the NCAA's application of the Five-Year Rule to include time spent at Junior Colleges violates the Sherman Act; and (ii) Robinson is eligible to play for UCLA during the 2025-2026 season;

B.      Preliminarily and permanently enjoining the NCAA from enforcing the Five-Year Rule against Robinson;

C.      Preliminarily and permanently enjoining the NCAA from enforcing the Rule of Restitution against Robinson and UCLA for complying with any injunctive order entered by this Court;

D.      Awarding Robinson compensatory and punitive damages, attorneys' fees and costs, prejudgment and post-judgment interest, and such other further relief as the Court may deem equitable and just and proper.

Date: July 14, 2025                       **Plummer, Carlyle, Williams, LLP**

                                                    /s/JaQay L. Carlyle
                                          _____
                                          JaQay L. Carlyle
                                          *Attorney for Kaedin Robinson*

**JURY DEMAND**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure and Local Rule 38-1, Plaintiff hereby demand a trial by jury.

Date:   July 14, 2025                     **Plummer, Carlyle, Williams, LLP**
                                                 /s/JaQay L. Carlyle
                                          _____
                                          JaQay L. Carlyle
                                          *Attorney for Kaedin Robinson*

## DECLARATION OF ELECTRONIC SERVICE

### Central District of California Case No.

Service of the attached document was accomplished pursuant to Central District of California, Order Authorizing Electronic Filing, General Order No. 08-03 and Local Rule 5.3-3, which provide in part: "Upon the electronic filing of a document, a Notice of Electronic Filing (NEF) is automatically generated by the CM/ECF system and sent by e-mail to all attorneys in the case who are registered as CM/ECF Users and have consented to electronic service. Service by this electronic NEF constitutes service pursuant to the Federal Rules of Civil and Criminal Procedure for all attorneys who have consented to electronic service."

I declare under penalty of perjury under the laws of the United States of America that the above is true and correct.

Executed on July 14, 2025 at Brea, California.

By: /s/  JaQay L. Carlyle
           JaQay L. Carlyle